Peter **BRINCKERHOFF**, Individually and on Behalf of All Others Similarly Situated, and Derivatively on Behalf of Teppco Partners, LLP, Plaintiff,

v.

**TEXAS EASTERN PRODUCTS PIPELINE COMPANY, LLC; Enterprise Products Partners, L.P.; Enterprise Products GP, LLC; Epco Inc.; Dan L. Duncan; Jerry E. Thompson; W. Randall Fowler; Michael A. Creel; Richard H. Bachmann; Richard S. Snell; Michael B. Bracy; and Murray H. Hutchison, Defendants,**

and

**Teppco Partners, L.P., Nominal Defendant.**

**In re Texas Eastern Products Pipeline Company, LLC Merger Litigation.**

Civil Action Nos. 2427–VCL, 4548–VCL.

Court of Chancery of Delaware.

Submitted: Oct. 21, 2009.

Decided: Jan. 15, 2010.

Joseph A. Rosenthal, Jessica Zeldin, Rosenthal, Monhait & Goddess, P.A., Wilmington, Delaware; Jeffrey H. Squire, Lawrence P. Eagel, Paul Wexler, Esquire, Bragar Wexler Eagel & Squire, PC, New York, New York; Attorneys for Plaintiffs Peter Brinckerhoff and Renee Horowitz.

A. Gilchrist Sparks, III, William M. Lafferty, Thomas W. Briggs, Jr., Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware; Attorneys for Defendants Enterprise Products Partners, L.P., Enterprise Products GP, LLC, W. Randall Fowler, Michael A. Creel and Richard H. Bachmann.

Vernon R. Proctor, Kurt M. Heyman, Dominick T. Gattuso, Proctor Heyman, LLP, Wilmington, Delaware; Attorneys for Nominal Defendant Teppco Partners, L.P.

Gregory P. Williams, Anne C. Foster, Rudolf Koch, Jennifer J. Veet, Richards Layton & Finger, P.A., Wilmington, Delaware; Attorneys for Defendants Richard S. Snell, Michael B. Bracy, Murray H. Hutchison, Jerry E. Thompson and Texas Eastern Products Pipeline Company, LLC.

Lawrence C. Ashby, Richard D. Heins, Richard L. Renck, Ashby & Geddes, Wilmington, Delaware; Attorneys for Defendants Dan L. Duncan and Epco, Inc.

Donald J. Wolfe, Jr., Mark A. Morton, Brian C. Ralston, Potter Anderson & Corroon LLP, Wilmington, Delaware; Attorneys for Defendants Donald H. Daigle, Duke R. Ligon and Irvin Toole, Jr.

Bruce Silverstein, Martin S. Lessner, Danielle Gibbs, Emily V. Burton, Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware; Brian J. Robbins, S. Benjamin Rozwood, Kelly M. McIntyre, Rebecca A. Peterson, Arshan Amiri, Robbins Umeda LLP, San Diego, California; John A. Lowther, William J. Doyle II, James R. Hail, Doyle Lowther LLP, San Diego, California; Attorneys for Objectors.

## OPINION

LASTER, Vice Chancellor.

I am asked to approve a settlement resolving two representative actions brought by holders of limited partnership units ("LP units") of Teppco Partners L.P. ("Teppco"). The first action, *Brinckerhoff v. Texas Eastern Products Pipeline Company, LLC,* C.A. No. 2427–VCL, challenged two transactions between Teppco and Enterprise Products Partners, L.P. ("Enterprise"). Defendant Daniel L. Duncan controlled both Teppco and Enterprise, and the plaintiffs contend that the transactions unfairly favored Enterprise. The claims appear strong. The parties refer to this action as the "Derivative Action."

The second action, *In re Texas Eastern Products Pipeline Company, LLC Merger Litigation,* C.A. No. 4548–VCL, challenged Enterprise's proposal to acquire Teppco by merger. The parties refer to this action as the "Merger Action." Duncan and other senior Enterprise executives decided a merger would be a good idea after the plaintiffs showed the strength of their claims in the Derivative Action. The record convinces me that the goal of extinguishing the plaintiffs' standing to maintain the Derivative Action was a primary reason for pursuing the merger. That is not to say that the Teppco–Enterprise combination does not yield benefits. The parties clearly regarded the merger as a good deal in its own right, and on this record, I agree. But I believe that the defendants seized an opportunity to kill two birds with one stone by obtaining the combinatorial benefits while getting rid of the Derivative Action.

In early April 2009, the defendants informed the plaintiffs about the merger proposal. On April 26, 2009, the same day Teppco publicly announced the proposal, the plaintiffs filed the Merger Action. At that point, the parties fell into the *pas de trois* described by Vice Chancellor Strine in *In re Cox Communications, Inc.*, 879 A.2d 604 (Del.Ch.2005), in which real litigation activity ceases and a special committee engages in coordinated two-track negotiations, one with the controller over the deal and the second with plaintiffs' counsel over the litigation. If the special committee and the controller close in on a transaction, then the plaintiffs' counsel gets a heads up so that the three sides can agree simultaneously on terms. The plaintiffs' claimed causal role in generating the transactional benefits—which the defendants concede to ensure consideration for a global release—in turn supports a fee award for plaintiffs' counsel.

The parties here ask me to approve a *Cox Communications* settlement that will resolve not only the Merger Action, but also the Derivative Action. The initial record was wholly inadequate for that purpose. Most troubling to my mind, the record established that the special committee focused repeatedly on the Derivative Action, embraced the premise that the claims had significant value, but then approved a deal in reliance on a fairness analysis that afforded no value whatsoever to those very same claims. These and other factors left me to wonder about the good faith of the special committee and brought to mind Chancellor Allen's admonition, offered in a different context, that "due regard for the protective nature of the stockholders' class action [and to which I would add derivative actions as well], requires the court, in these cases, to be suspicious, to exercise such powers as it may possess to look imaginatively beneath the surface of events, which, in most instances, will itself be well-crafted and unobjectionable." *In re Fort Howard Corp. S'holders Litig.*, 1988 WL 83147, at *12 (Del.Ch. Aug.8, 1988) (ruling on preliminary injunction against management buy-out). It did not require much suspicion or imagination to think that extrinsic factors might have colored the judgment of the special committee and plaintiffs' counsel when agreeing to a *Cox Communications* settlement. The lure of a premium transaction, the self-evident benefits of settlement to the controller and other defendants, and the prospect of an easy end to the litigation—coupled with a large fee—create powerful pressures. No one need cross the line of collusion or conscious shirking for these forces to have an effect. "[H]uman nature may incline even one acting in subjective good faith to rationalize as right that which is merely personally beneficial." *City Capital Assocs. v. Interco Inc.*, 551 A.2d 787, 796 (Del.Ch.1988) (Allen, C.)

During the settlement hearing, plaintiffs' counsel failed to address my concerns and essentially reiterated arguments from their brief. The special committee's counsel, however, offered to supplement the record with additional materials that would show how the special committee valued the Derivative Action and demonstrate that their financial advisor took it into account. After considering the supplemented record, although the question remains close, I approve the settlement. I award aggregate attorneys' fees and expenses to plaintiffs' counsel of $10 million, authorize plaintiffs' counsel to pay $100,000 to plaintiff Brinkerhoff for his significant role in the litigation, and award $80,000 to objectors' counsel.

## I. FACTUAL BACKGROUND

I derive the facts from the record presented for settlement approval. The rec-

ord developed in the Derivative Action was extensive. The plaintiffs obtained approximately half a million pages of documents and took four depositions, with twelve more scheduled when the litigation was put on hold. The parties provided me with their opening and answering mediation statements, which resemble summary judgment briefs in their length and citations to evidence. Both parties retained experts, and I have their reports.

The record for the Merger Action is meager, largely because in classic *Cox Communications* style, the plaintiffs did not actually litigate. The pre-hearing record for the Merger Action thus comprised redacted minutes of special committee, audit committee and board meetings, the proxy statement for the merger, and two desultory confirmatory discovery depositions.

Since the hearing, I have been given three supplemental affidavits: one from Donald H. Daigle, the chair of the special committee; one from Donald J. Wolfe, Jr., the lead lawyer from Potter, Anderson & Corroon LLP ("Potter Anderson"), the special committee's Delaware counsel; and one from Greg Weinberger, a managing director who led the team from Credit Suisse Securities (USA) LLC, the special committee's financial advisor. As exhibits to the Wolfe affidavit, I have been given unredacted copies of minutes for certain special committee meetings and a detailed valuation of the Derivative Action prepared by Houlihan Lokey, who was hired solely for that purpose. Potter Anderson used the Houlihan Lokey valuation to develop its own assessment of the value of litigation (which departed upward from Houlihan Lokey's financial range) and to advise the committee on its duties and negotiations with Enterprise. Attached to the Weinberger affidavit is a one page sensitivity analysis prepared for the com-

mittee by Credit Suisse which adjusted the range of fair exchange ratios implied by Credit Suisse's discounted cash flow analysis to reflect values for the Derivative Action. One bar adjusted the fairness range based on Potter Anderson's assessment. A second bar adjusted the fairness range to reflect the $500 million recovery that plaintiffs' counsel advised the committee would represent a good settlement. The deal remained within the range of fairness with these adjustments.

Because this is a settlement record, my account does not represent factual findings, but rather my distillation of a paper record for the limited purpose of evaluating the fairness of the proposed settlement. Many of the facts are uncontested; others are vigorously disputed.

## A. The Parties

Peter Brinckerhoff is the representative plaintiff in both the Derivative Action and the Merger Action. Renee Horowitz, as attorney in fact for Rae Kenrow, is a representative plaintiff in the Merger Action. Both have averred that they owned Teppco LP units at all relevant times. Although Horowitz is not a plaintiff in the Derivative Action, for convenience I use the plural term "plaintiffs."

Teppco is the nominal defendant in the Derivative Action. Teppco is a Delaware master limited partnership that operates in the upstream, midstream, and downstream segments of the oil and gas industry. Pursuant to an agreement and plan of merger dated as of June 28, 2009, Teppco became a wholly owned subsidiary of Enterprise, and each Teppco LP unit was converted into the right to receive 1.24 Enterprise LP units (the "Merger"). The Merger closed on October 26, 2009. Prior to the Merger, Teppco's LP units traded on the New York Stock Exchange under the ticker symbol "TPP." Teppco's sole

general partner is defendant Texas Eastern Products Pipeline Company, LLC ("Teppco GP"), a Delaware limited liability company. Through an affiliate, Duncan acquired 100% of Teppco GP in February 2005. In May 2007, Duncan transferred ownership of Teppco GP to Enterprise Holdings, defined below.

Enterprise is a defendant in both the Derivative Action and the Merger Action. Enterprise is another publicly traded Delaware master limited partnership operating in the oil and gas industry, and its LP units trade on the New York Stock Exchange under the ticker symbol "EPP." Enterprise's general partner is defendant Enterprise Products GP, LLC ("Enterprise GP"), a Delaware limited liability company.

The sole member of both Teppco GP and Enterprise GP is non-party Enterprise GP Holdings, L.P. ("Enterprise Holdings"), a third publicly traded Delaware master limited partnership whose LP units trade on the New York Stock Exchange under the ticker symbol "EPE." Both Teppco GP and Enterprise GP are governed by a board of directors. As the sole member of Teppco GP and Enterprise GP, Enterprise Holdings has the exclusive and unfettered ability to determine the composition of the Teppco GP and Enterprise GP boards. The sole general partner of Enterprise Holdings is non-party EPE Holdings, LLC ("EPE Holdings GP").

Duncan is a defendant in both the Derivative Action and the Merger Action. He is a highly successful oil and gas entrepreneur and self-made multi-billionaire. Duncan is Chairman of Enterprise GP, controls EPE Holdings GP, and controls Enterprise Holdings through EPE Holdings GP. Through Enterprise Holdings, Duncan controls Teppco GP and Enterprise GP. Through those entities, Duncan controls Teppco and Enterprise.

In addition to controlling the general partners of Teppco and Enterprise, Duncan controls EPCO, Inc., a Texas corporation that is a defendant in both the Derivative Action and the Merger Action. Duncan and his family owned all or virtually all of EPCO, and EPCO's tendrils extended throughout the Teppco–Enterprise family.

EPCO provides a variety of administrative, operating, and management services to Teppco and Enterprise. Most strikingly, EPCO provides Enterprise GP and Teppco GP with all of their employees. Thus even though Teppco GP prior to the Merger operated a publicly traded master limited partnership worth billions of dollars, Teppco GP did not employ anyone. All of Teppco GP's executives and staff came from EPCO. Duncan controlled EPCO and set all of the EPCO employees' salaries, bonuses, and severance. EPCO employees regularly shifted back and forth between Teppco GP and Enterprise GP and often held positions with both companies. The executive who oversaw the transactions that gave rise to the Derivative Action, for example, was an EPCO employee who held senior officer positions with both Teppco GP and Enterprise GP. In 2006, Teppco paid EPCO $136.9 million for payroll, administrative, and other services, an increase of almost 50% over Teppco's comparable expenses in 2005, before Duncan acquired control of Teppco GP. An Administrative Services Agreement between Teppco and EPCO provided that Enterprise, rather than Teppco, would have the right to pursue any business opportunity presented to EPCO or its affiliates.

In addition to Duncan, the individual defendants in the Derivative Action are Richard Bachmann, W. Randall Fowler,

Michael Creel, Michael Bracy, Murray Hutchison, Richard Snell, and Jerry Thompson, who comprised the board of directors of Teppco GP at the time the initial complaint in the Derivative Action was filed. Each director had obvious connections to Duncan or Enterprise, and a majority had conflicts that were facially compromising for purposes of any transaction between Teppco and Enterprise. Bachmann was an Executive Vice President of EPCO, a director and Executive Vice President of Enterprise GP, and a director of EPE Holdings GP. Fowler was the Chief Financial Officer of EPCO and Senior Vice President and Treasurer of Enterprise GP. Creel was an Executive Vice President of EPCO, an Executive Vice President of Enterprise GP, and a director of Enterprise GP and EPE Holdings GP. Thompson was an EPCO employee and the President and CEO of Teppco GP. Snell was a director of Enterprise GP and had been Bachman's law partner. Bracy had been a director of GulfTerra Energy Partners, L.P., a publicly traded oil and gas master limited partnership that Enterprise acquired in 2004. Hutchison was Duncan's close personal friend.

At the time of the transactions challenged in the Derivative Action, Snell, Bracy, and Hutchison comprised the Audit and Conflicts Committee of the board of directors of Teppco GP. The Audit and Conflicts Committee was later renamed the Audit, Conflict and Governance Committee, and I will refer to the Committee under both titles as the "Teppco Audit Committee." Following Potter Anderson's arrival on the scene, the membership of the Teppco Audit Committee was altered to address its sub-optimal composition and facilitate the formation of a special committee. I describe those events below.

In addition to Duncan, the individual defendants in the Merger Action are Thompson, Snell, Bracy, Hutchison, Donald H. Daigle, Duke Ligon, and Irvin Toole, Jr. They comprised the board of directors of Teppco GP at the time the Merger Action was filed.

**B. The Challenged 2006 Transactions**

After acquiring Teppco GP in 2005, Duncan caused Teppco and Enterprise to engage in a series of transactions that shared the common theme of moving assets from Teppco to Enterprise. Two transactions became the subject of the Derivative Action. Both related to the Jonah Gas Gathering Company ("Jonah"), a Wyoming partnership that operates a system for gathering and processing natural gas in the Jonah and Pinedale gas fields of Wyoming. Through an extensive network of pipelines, Jonah gathers raw gas from wells operated by exploration and production companies like EnCana Oil & Gas (USA) Inc. ("EnCana"), BP America Inc., Ultra Petroleum, and Shell Exploration and Production Company. Jonah collects the gas, compresses it, and delivers it to Jonah's processing facilities. The facilities extract water, natural gas liquids like propane, butane, and gasoline, and various byproducts. The remaining natural gas can then be sold by the producers.

Duncan originally coveted Jonah for Enterprise. In 2001, Duncan tried to buy Jonah from its then-owner, EnCana. Teppco outbid Duncan and acquired Jonah.

In March 2005, a month after obtaining control over Teppco GP, Duncan drafted an internal proposal for Teppco to expand Jonah's gathering and processing system by approximately 60%. In summary, Teppco would contract with EnCana to add compressors to lower the pressure in the system, thereby increasing the flow of gas from the producers' wells. Teppco would expand Jonah's processing capacity

at a silica gel processing plant, referred to as the "Pioneer Plant." Teppco also would add a new cryogenic processing facility. I refer to these plans as the "Jonah Expansion."

By January 2006, Jonah and EnCana had agreed on terms for the Jonah Expansion. Now comes a disputed fact. According to the plaintiffs, Duncan and his fellow defendants in the Derivative Action sought to ensure that Teppco did not enter into binding agreements with EnCana until *after* Enterprise signed a letter of intent with Teppco for two transactions of its own. As the Teppco–EnCana agreement loomed, Enterprise proposed (and Teppco agreed) to separate the two Teppco–Enterprise transactions and execute two letters of intent. In the first letter of intent, dated January 25, 2006, Teppco agreed to sell Enterprise the Pioneer Plant and all of Teppco's related gas processing rights, present and future (collectively, the "Pioneer Sale"). In the second letter of intent, dated February 13, 2006, Teppco and Enterprise agreed to form a joint venture that would own Jonah post-expansion (the "Jonah Joint Venture"). Neither letter of intent included financial terms. On February 1, 2006, in between the two letters of intent, Teppco and EnCana executed the formal agreements for the Jonah Expansion.

Plaintiffs contend that Duncan had obvious reasons to favor Enterprise. Prior to the Merger, Duncan always owned a greater percentage of Enterprise's LP units than Teppco's, and his disproportionate ownership gave him an economic incentive to shade things Enterprise's way. Until December 2006, Duncan owned (directly or through affiliates) approximately 34.5% of Enterprise's LP units versus only 3.5% of Teppco's. As of August 31, 2009, the record date for the Merger, Duncan owned approximately 34.9% of Enter-

prise's LP units versus 16.3% of Teppco's. Duncan also had stronger personal ties to Enterprise. Duncan acquired control of Teppco in 2005, but formed Enterprise over four decades ago, built up the company, took it public, and turned it into the foundation of his personal wealth.

### 1. Teppco And Enterprise Move Forward With The Pioneer Sale.

On February 15, 2006, Enterprise offered to pay $38 million in the Pioneer Sale. The Teppco Audit Committee made a $40 million counter offer, then accepted Enterprise's number.

The letter of intent for the Pioneer Sale required Teppco to obtain an opinion as to the financial fairness of the transaction to Teppco. The Teppco Audit Committee hired Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch") to provide the opinion. Merrill Lynch had worked regularly for Enterprise between 2004 and 2006.

For disputed reasons, Merrill Lynch assessed the fairness of the Pioneer Sale by valuing only Teppco's rights under the processing contract as it existed prior to the Jonah Expansion. Using those parameters, Merrill opined that $38 million was fair.

Meanwhile, Enterprise hired Simmons & Co. to opine on the financial fairness of the Pioneer Sale to Enterprise. Simmons valued Teppco's rights taking into account the Jonah Expansion. Simmons valued the deal at $780 million.

On March 31, 2006, the Pioneer Sale closed with Enterprise paying only $38 million. The plaintiffs contend that the transaction has been enormously profitable for Enterprise and generated returns in excess of the value Simmons placed on it.

### 2. Teppco And Enterprise Move Forward With The Jonah Joint Venture.

In parallel with the Pioneer Sale, Teppco and Enterprise moved forward with the Jonah Joint Venture. The financial terms were negotiated by Teppco and Enterprise management, all of whom were EPCO employees under Duncan's control. Teppco agreed to contribute Jonah to the joint venture, and Teppco and Enterprise each committed to fund half of the cost of the proposed Jonah Expansion. But in an important deal point, Jonah was valued based on Teppco's historic cost of investment, not Jonah's value as a going concern.

The selection of this method made a difference. Under the agreed-upon approach, Teppco was credited with a capital contribution of approximately $800 million, representing the historic purchase price for Jonah, prior investments of approximately $250 million, and Teppco's portion of the future financing. Enterprise was credited with $208 million, representing its portion of the future financing. This calculation resulted in Teppco owning approximately 80% and Enterprise owning approximately 20% of the Jonah Joint Venture.

Had Jonah been valued as a going concern, its value would have exceeded Teppco's historic investment and changed the ownership allocation of the joint venture. Alternatively, if Enterprise wanted a 20% stake, it would have had to invest more. Based on traditional valuation metrics, the plaintiffs contend that the post-expansion Jonah Joint Venture had an implied value about $2.192 billion. This implied that the *pro rata* value of a 20% interest was approximately $438.4 million, more than double Enterprise's capital commitment of $208 million. The plaintiffs do not discount the *pro rata* value for lack of control because although Enterprise owned a minority interest, Teppco and Enterprise agreed that Enterprise would manage Jonah on a day-to-day basis and that any disagreements would be resolved by a committee comprised of EPCO employees. Teppco also waived the right it secured in the February 13, 2006, letter of intent to repay Enterprise's capital contribution and re-gain full ownership of Jonah.

The letter of intent for the Jonah Joint Venture required a fairness opinion. Teppco expected Goldman Sachs, which had been exploring financing alternatives for Teppco, to opine as to fairness. For disputed reasons, Goldman declined. Duncan responded by informing the directors of Enterprise and Teppco that fairness opinions are often unnecessary and wasteful and representing that he had no motive to favor Enterprise over Teppco. The Teppco Audit Committee approved the deal.

As with the Pioneer Sale, Simmons opined as to fairness to Enterprise. Simmons used traditional valuation metrics to conclude that Enterprise was purchasing its interest at a base case EBITDA multiple of 7.0x. The mean EBITDA multiple implied by a comparable transactions analysis was 9.3x and the mean EBITDA multiple implied by a comparable companies analysis was 12.8x. Enterprise again appears to have gotten a sweet deal.

On August 1, 2006, the Jonah Joint Venture closed on the agreed terms. The plaintiffs contend that the joint venture has been enormously profitable.

### C. The Derivative Action

On September 18, 2006, plaintiffs filed the Derivative Action. On July 12, 2007, plaintiffs filed an amended complaint that remains the operative pleading in the Derivative Action.

The amended complaint set forth three counts. Count One asserted a claim against the Teppco GP directors, Duncan, EPCO, and Teppco GP for breaches of fiduciary duty in connection with the Jonah Joint Venture and the Pioneer Sale. Count Two asserted a claim against Enterprise and Enterprise GP for aiding and abetting the breaches of fiduciary duty alleged in Count One. Count Three challenged the disclosures made in connection with December 2006 amendments to Teppco's limited partnership agreement and an exchange transaction in which Teppco GP relinquished the highest tranche of its cash flow distribution rights in exchange for 14.1 million Teppco LP units worth approximately $528 million.

Pursuant to Rule 12(b)(6), all defendants moved to dismiss Count Three, and certain defendants moved to dismiss Count One. No one raised Rule 23.1. Vice Chancellor Lamb denied the motion to dismiss Count One but granted the motion to dismiss Count Three. *Brinckerhoff v. Texas Eastern Products Pipeline Co., LLC*, 2008 WL 4991281 (Del.Ch. Nov.25, 2008).

While the parties litigated the motion to dismiss, the plaintiffs conducted written discovery and began taking depositions. Plaintiffs obtained approximately half a million pages of documents and responses to four sets of interrogatories. Plaintiffs also reviewed publicly available documents filed with the SEC, the Bureau of Land Management, and the State of Wyoming. Plaintiffs' counsel retained five experts and traveled to Wyoming to inspect the Jonah gas gathering system.

In October 2008, plaintiffs' counsel began taking depositions. By mid-January 2009, Plaintiffs' counsel had deposed Robert Pacha, a managing director of Merrill Lynch; John Goodpasture, Teppco's Director of Development; defendant Bracy, and William Ordemann, who in 2006

served simultaneously as a Senior Vice President of both Enterprise and Teppco. Twelve additional depositions were scheduled to be completed before the discovery cutoff of April 30, 2009, including Duncan, the other defendants, Ralph Cunningham, then-President and CEO of Enterprise GP Holdings, and representatives of Goldman Sachs, Simmons, and EnCana.

On January 21, 2009, the defendants offered to take the plaintiffs up on their prior offer to mediate the claims in the Derivative Action pursuant to Court of Chancery Rule 174, as long as discovery was stayed. They plaintiffs agreed. During the ensuing ten weeks, the parties prepared simultaneous opening and answering mediation statements, supported by extensive exhibits, in preparation for a mediation scheduled for April 30.

### D. Duncan And Enterprise Propose A Merger.

The defendants' proposal to put discovery on hold and mediate the case came just two days after a January 19, 2009, meeting between Duncan and members of Enterprise senior management at which they decided to pursue a merger. That meeting came four days after the two-day Ordemann deposition. A review of the deposition transcript reveals the strength of the plaintiffs' case.

On January 29, 2009, Enterprise management discussed the merger idea with the Enterprise Audit, Conflicts and Governance Committee (the "Enterprise Audit Committee"). The Enterprise Audit Committee retained counsel and later hired Barclays Capital ("Barclays"), the investment banking division of Barclays Bank PLC, as its financial advisor.

On February 17, 2009, members of Enterprise management and the Chairman of the Enterprise Audit Committee met with

defendant Hutchinson, then serving as Interim Chairman of the board of directors of Teppco GP, and proposed that Enterprise acquire Teppco by merger. On February 20, Hutchinson reported on the meeting to the full Teppco GP Board. On February 23, Teppco and Enterprise entered into a confidentiality agreement. The same day, the Teppco Audit Committee engaged Mayer Brown LLP as its special counsel. One of the Teppco GP Board's first considerations was how a merger would affect the Derivative Claims.

On March 9, 2009, Enterprise made its initial offer. Enterprise proposed a merger in which each outstanding Teppco LP unit would be converted into 1.043 Enterprise LP units plus one dollar in cash, for total consideration at Enterprise's then-current market price of $21.89 per LP unit. The exchange ratio was at market. The one dollar in cash was intended to compensate Teppco unitholders for the net present value of losing the higher quarterly distributions that Teppco paid. If framed solely as an exchange ratio, consideration of $21.89 per Teppco LP unit equated to 1.083 Enterprise LP units.

On March 16, 2009, the Teppco Audit Committee met to consider Enterprise's March 9 proposal. At a meeting on March 24, the Teppco Audit Committee retained Potter Anderson as its Delaware counsel and Credit Suisse as its financial advisor. The Teppco Audit Committee decided to reject Enterprise's initial offer as "unacceptably low because, among other things, it inadequately valued Teppco's business and did not take into account the potential value of the [Derivative Action]."

With Potter Anderson on the scene, the corporate record became noticeably more polished, with marked attention paid to key procedural steps. For example, at the time Potter Anderson was hired, the Teppco Audit Committee consisted of Bracy, Snell, and Daigle. Bracy and Snell were both defendants in the Derivative Action and had other ties to Duncan. The Teppco Audit Committee tried to sidestep this awkward fact by appointing Daigle "Project Chairman" for the Merger and letting him take the lead. Promptly after Potter Anderson's retention, the committee's suboptimal composition was addressed in a meaningful way: On March 30, Daigle recommended to the Teppco Audit Committee that two new, independent directors be appointed to the Teppco GP board. After a three week recruitment process, on April 22, Enterprise GP Holdings appointed Ligon and Toole. They were added to the Teppco Audit Committee, when then formed a special committee consisting of Daigle, Ligon, and Toole (the "Teppco Special Committee").

Likewise, prior to Potter Anderson's arrival, the Teppco Audit Committee and its "Project Manager" were operating without a clear articulation of their roles and responsibilities. The resolution creating and empowering the Teppco Special Committee provided that articulation and reflects a nuanced understanding of the powers that a Delaware court expects a well-functioning special committee to have. Most critically, the resolution explicitly granted the Teppco Special Committee exclusive authority to review, evaluate, negotiate, and to recommend, or reject, a proposed merger. The committee thus had exclusive authority to say "no" to a transaction with Enterprise. The resolution also empowered the Special Committee to retain its own legal and financial advisors. At the April 22 meeting, the Special Committee retained Mayer Brown and Potter Anderson as its own legal advisors and Credit Suisse as its financial advisor.

### E. The Parties Shift Into *Cox Communications* Mode.

Meanwhile, on April 9, 2009, defendants' counsel advised plaintiffs' counsel of the

potential Merger and expressed their view that the Merger would extinguish the plaintiffs' standing to pursue the Derivative Action. Plaintiffs' counsel accepted that assumption without challenge. The parties agreed to adjourn the mediation for sixty days to allow Teppco and Enterprise to negotiate a deal.

On April 29, 2009, Teppco announced publicly that Enterprise had made a proposal. That same day, plaintiffs filed the Merger Action. Plaintiffs did not move to expedite, did not take any discovery, and did not seek to enjoin the Merger.

The parties instead started the *Cox Communications* minuet. Along the first track, on May 19, 2009, the Teppco Special Committee counter-proposed an exchange ratio of 1.48 Enterprise LP units for each Teppco LP unit with no cash component.

On June 15, 2009, Enterprise countered with a proposed ratio of 1.197. The next day, the Teppco Special Committee asked for 1.275, and the parties agreed to split the difference at 1.24. Thus, within twenty-four hours of receiving Enterprise's second bid, Teppco and Enterprise had a deal.

Along the second track, the Teppco Special Committee met with plaintiffs' counsel and their experts on May 6, 2009. Otherwise I am told that plaintiffs' counsel and Potter Anderson kept in touch and communicated regularly.

For its part, the Teppco Special Committee discussed on June 16, 2009, "the appropriate time to engage the Plaintiff in settlement discussions." The committee decided that "if possible, the Committee would inform the Plaintiff of the merger price only after the Committee reached an agreement on price with [Enterprise]."

On June 18, 2009, after the Special Committee reached an agreement in principle with Enterprise on an exchange ratio of 1.24, Potter Anderson called plaintiffs' counsel and asked them to sign on by settling all litigation. Plaintiffs' counsel asked for a covenant that Enterprise would increase its distributions to be equivalent to Teppco's on an as-converted basis. Enterprise declined, and the plaintiffs took the deal. The parties then executed a memorandum of understanding to settle all pending litigation in consideration for the closing of the Merger. The converse was not true, *i.e.*, the closing of the Merger was not conditioned on the settlement of the litigation.

On June 28, 2009, the Teppco Special Committee met with its advisors and reviewed the proposed form of merger agreement and transaction-related documents. Credit Suisse opined that the 1.24 unit exchange ratio was fair from a financial point of view to the unaffiliated Teppco unitholders. As I discuss below, Credit Suisse's presentation did not attribute any value to the Derivative Action. It was only after the Special Committee's counsel supplemented the record that I learned the Special Committee actually received a one-page valuation that took into account the Derivative Action. The Teppco Special Committee unanimously approved the Merger and recommended it to the Teppco Audit Committee. The Teppco Audit Committee approved the Merger and recommended it to the Teppco GP board. The Teppco GP board approved the Merger and recommended it to the Teppco LP unitholders.

The parties filed a formal settlement stipulation on August 6, 2009. I held a settlement hearing on October 12, during which I expressed my dissatisfaction with the confirmatory discovery record and significant reservations about the settlement. I granted the request of counsel for the Teppco Special Committee to supplement the record, which they did on October 21.

## II. LEGAL ANALYSIS

My focus is on the fairness of the settlement and the amount of any fee award. I have no difficulty with and explicitly find that the notice of the settlement was adequate, the proposed definition of the class in the Merger Action is appropriate, the requirements of Rule 23(a)(1)(4) are met, and the action is properly certified under Rules 23(b)(1) and (b)(2). *See Prezant v. De Angelis,* 636 A.2d 915, 925 (Del.1994) (requiring an "explicit determination on the record on the record of the propriety of the class action according to the requisites of Rule 23(a) and (b)"). I will not dilate on these issues because they are controlled by well-settled law. Recent and thorough treatments can be found in *In re Philadelphia Stock Exchange, Inc.,* 945 A.2d 1123 (Del.2008), and *CME Group, Inc., v. Chicago Board of Options Exchange, Inc.,* 2009 WL 1547510 (Del.Ch. June 3, 2009).

I also will not consider in detail whether the closing of the Merger extinguished the plaintiffs' standing to assert the Derivative Action. No party has raised the plaintiffs' potential loss of standing as a basis for dismissal or sought to modify the settlement. *See In re Caremark Int'l, Inc. Deriv. Litig.,* 698 A.2d 959, 972 n. 30 (Del. Ch.1996) (Allen, C.) (approving settlement in derivative action despite being "informed by letter of counsel that after the fairness of the proposed settlement had been submitted to the court, Caremark was involved in a [stock-for-stock] merger").

More importantly, although styled as derivative claims, the Teppco limited partnership agreement specifically prohibited the actions that were challenged in the Derivative Action, and the plaintiffs had standing as limited partners to enforce the limited partnership agreement directly. The wrongs challenged in the Derivative Action thus gave rise to both a derivative right of action on behalf of Teppco and a direct right of action by the limited partners for breach of the limited partnership agreement. If I were determining whether the action should be subject initially to the heightened pleading requirements of the statutory limited partnership analogs to Rule 23.1, *see* 6 *Del. C.* §§ 17–1001 to 17–1003, then treating the action as primarily derivative under *Tooley v. Donaldson,* 845 A.2d 1031 (Del.2004), would serve the core Delaware public policies of promoting internal dispute resolution and ensuring that Teppco GP had the first opportunity to address and control the claim. Now, however, as a result of the Merger, the distinctions between a derivative action on behalf of Teppco for the indirect benefit of its LP unitholders and a class action on behalf of those same Teppco LP unitholders have blurred. At the singularity of the effective time, the identity of the Teppco LP unitholders became forever fixed. In light of the dual nature of the claim, I would see no reason why the plaintiffs could not have continued their action post-Merger as a *de facto* class action on behalf of holders of Teppco LP units as of the effective time.

Regardless, even if the action were properly cast as derivative, Delaware law recognizes an exception to the continuous ownership requirement when "a principal purpose of the merger was the termination of the then pending derivative claims." *Merritt v. Colonial Foods, Inc.,* 505 A.2d 757, 763 (Del.Ch.1986) (Allen, C.); *see Lewis v. Anderson,* 477 A.2d 1040, 1046 n. 10 (Del.1984) (noting equitable exceptions to continuous ownership requirement). The facts here readily support the inference that eliminating the Derivative Action was a principal purpose for the Merger, albeit certainly not the only purpose.

Given the strong likelihood that the Derivative Action could have continued post-Merger in some form, I accept the parties' practical decision to submit the settlement as a proposed resolution of both the Derivative Action and the Merger Action. I will therefore proceed to consider the fairness of the settlement and the amount of the fee award.

## A. The Fairness Of The Settlement

■ "The law, of course, favors the voluntary settlement of contested issues." *Rome v. Archer*, 197 A.2d 49, 53 (Del. 1964). The settlement of representative litigation, however, is "unique because the fiduciary nature of the [litigation] requires the Court of Chancery to participate in the consummation of the settlement to the extent of determining its intrinsic fairness." *Id.* at 53. "The Court of Chancery plays a special role when asked to approve the settlement of a class or derivative action. It must balance the policy preference for settlement against the need to insure that the interests of the class have been fairly represented." *Barkan v. Amsted Indus., Inc.*, 567 A.2d 1279, 1283 (Del.1989).

■ When assessing fairness, I am not required to make a definitive evaluation of the case on its merits. "To do so would defeat the basic purpose of the settlement of litigation." *Rome*, 197 A.2d at 53. I rather must consider the nature of the claims, possible defenses, the legal and factual circumstances of the case, and then apply my own business judgment in deciding whether the settlement is reasonable. *Polk v. Good*, 507 A.2d 531, 535 (Del.1986). "The Court must especially balance the value of all the claims being compromised against the value of the benefit to be conferred on the Class by the settlement." *In re MCA, Inc.*, 598 A.2d 687, 691 (Del.Ch. 1991).

■ A transactional settlement that follows the *Cox Communications* paradigm requires particular scrutiny because of the nigh-on formulaic nature of the process:

> When a [controller] announces a "proposal" to negotiate a going private merger, the controller is, like any bidder, very unlikely to present his full reserve price as its opening bid. Moreover, given [Delaware law's] emphasis on the effectiveness of the special committee as a bargaining agent, the controller knows, and the special committee members will demand, that real price negotiations proceed after the opening bid, and that those negotiations will almost certainly result in any consummated deal occurring at a higher price.

> For plaintiffs' lawyers, the incentives are obvious. By suing on the proposal, the plaintiffs' lawyers can claim that they are responsible, in part, for price increases in a deal context in which price increases are overwhelmingly likely to occur.... Add to this another important ingredient, which is that once a special committee has negotiated a material price increase with the aid of well-regarded financial and legal advisors, the plaintiffs' lawyer can contend with a straight-face that it was better to help get the price up to where it ended than to risk that the controller would abandon the day.... Having vigorously aided the special committee to get into the range of fairness, and having no reason to suspect that the special committee was disloyal in its mission, the plaintiffs' lawyers can say, in plausible good faith, that it was better for the class to take the improved bid....

879 A.2d 604, 622 (Del.Ch.2005). Plaintiffs' lawyers thus have ample reason to go along with what a special committee negotiates, settle on the basis of the deal, and apply for their fee.

Nor are plaintiffs' lawyers the only parties who gain from transactional settlements. The defendants get a broad release. Defendants "customarily seek[ ] a release with the broadest possible scope." Philadelphia Stock Exchange, 945 A.2d at 1145. They appropriately want "complete peace." Id. at 1137. The language of a release typically extends to all possible claims, known or unknown, asserted or unasserted, arising out of or relating to the events that were the subject of the litigation, and this short summary fails to capture the expansive breadth of these typically multi-page, "prolix," and sometimes "incomprehensible" provisions. *UniSuper Ltd. v. News Corp.*, 898 A.2d 344, 347 (Del.Ch.2006). A standard global release also encompasses claims that could not have been litigated in the settled action, such as federal securities claims. *Matsushita Elec. Indus. Co. v. Epstein,* 516 U.S. 367, 386, 116 S.Ct. 873, 134 L.Ed.2d 6 (1996); *Nottingham Partners v. Dana,* 564 A.2d 1089, 1105 (Del.1989).

For the same reasons that *Cox Communications* questioned how much plaintiffs' lawyers add to transactional negotiations and get in return for their claims, a reviewing court can and should question how much consideration was provided for the release that blesses the transaction and exonerates the defendants. In an extreme case, if the parties would have negotiated the same deal anyway, then the defendants get the release for the marginal cost of the award of attorneys' fees. In the context of many transactions, the incremental cost of the attorneys' fees is relatively small. *Cox Comm'ns,* 879 A.2d at 622. If insurance covers the fee, then in the short run the release is free. In the long run, stockholders pay via returns dragged down by higher insurance premiums and the other costs of a litigation model in which outcomes become decoupled from the merits of the underlying claims. If insurance is not available, the acquiring company pays, and in the long run stockholders again foot the bill.

The attractiveness of a transactional settlement thus creates risk that the interests of defendants and plaintiffs' counsel will coincide well before they officially align in support of an agreed-upon settlement. The appearance of a transaction on the horizon exacerbates the classic agency problems inherent in representative litigation:

> [T]he principals, the claim-holding members of the shareholder class have little or no role in negotiating the settlement of the action or the fees their agents, the attorneys, will receive in conjunction with the settlement of the claims.... At most, they possess the opportunity to object to [the settlement or] a proposed award of attorneys' fees.

*In re Nat'l City Corp. S'holders Litig.,* 2009 WL 2425389, at *5 (Del.Ch. July 31, 2009). One need not question the good faith of any participant in the process to recognize that an alignment of interests encourages the crafting of a favorable record of settlement negotiations. *Weinberger v. Great N. Nekoosa Corp.,* 925 F.2d 518, 525 (1st Cir.1991); *see Cox Comm'ns,* 879 A.2d at 621 (describing the "artistry" in the two-track process).

Once the parties have reached a negotiated settlement, "the litigation enters a new and unusual phase where former adversaries join forces to convince the court that their settlement is fair and appropriate." *Ginsburg v. Philadelphia Stock Exch., Inc.,* 2007 WL 2982238, at *1 (Del. Ch. Oct.9, 2007). Confirmatory discovery performances ranging from the diffident to the feckless impair, rather than inspire, judicial confidence. *See, e.g., In re Coleman Co., Inc. S'holders Litig.,* 750 A.2d 1202, 1212 (Del.Ch. Nov.12, 1999) ("[C]on-

firmatory discovery in settlement situations is hardly the equivalent of adversarial pre-trial discovery."). Unless an objector appears and challenges the settlement, the proceedings will be uncontested. Here, objectors appeared, then resolved their objection for a two-page supplemental disclosure and an unopposed fee application.

All of the problematic dynamics of the *Cox Communications* paradigm are reinforced when a transactional settlement will resolve not only challenges to the transaction itself, but also an underlying derivative action. This case offers a prime example. The defendants knew they faced a real claim that had survived a motion to dismiss. They were in the midst of discovery and looking towards a trial and potentially adverse result. They thus had even greater incentives to use a transaction to resolve the litigation. Meanwhile, absent an exception to the traditional doctrine of claim extinction by merger, the closing of a transaction could leave the plaintiffs' lawyers high and dry. The plaintiffs here did not raise a peep about continuing the Derivative Action but rather accepted the ready-made settlement opportunity. Everyone had ample reason to "settle" otherwise viable claims in exchange for the "benefits" provided by the proposed deal.

It is, of course, possible that the consideration provided in a merger could be sufficient to compensate stockholders for their ownership interest in the acquired corporation, including any derivative claims against the acquired corporation's management, directors, controller, or their affiliates. But because of the web of competing incentives, I believe this Court must give significant scrutiny to *Cox Communications* settlements, and particularly those that simultaneously resolve pending derivative claims.

### 1. The Strength Of The Plaintiffs' Claims

As I noted at the outset, the claims in the Derivative Action appear strong. The operative Teppco limited partnership agreement at the time of the 2006 transactions was the Third Amended and Restated Agreement of Limited Partnership of Teppco Partners, L.P. dated September 21, 2001 (the "Third LP Agreement"). Section 6.6(e) of the Third LP Agreement specifically governed transactions between Teppco and an affiliate.

The definition of "Affiliate" set forth in the Third LP Agreement stated:

> "Affiliate" means, with respect to any Person, any other Person that directly or indirectly controls, is controlled by or is under common control with, the Person in question. As used herein, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise.

Third LP Agreement, art. 2. The record convinces me that the plaintiffs easily could establish at trial that Teppco and Enterprise were both controlled by Duncan, and that Teppco and Enterprise were thus "Affiliates" under the Third LP Agreement.

Section 6.6(e) of the Third LP Agreement provided as follows:

> Neither the General Partner nor any of its Affiliates shall sell, transfer or convey any property to, or purchase any property from, the Partnership, directly or indirectly, except pursuant to transactions that are fair and reasonable to the Partnership; provided, however, that the requirements of this Section 6.6(e) shall be deemed to be satisfied as to any transaction the terms of which are no less favorable to the Partnership than

those generally being provided to or available from unrelated third parties. Third LP Agreement § 6.6(e). Section 6.9(c) further provided that "[w]henever a particular transaction, arrangement, or resolution of a conflict of interest is required under this Agreement to be 'fair and reasonable' to any Person, the fair and reasonable nature of such transaction, arrangement or resolution shall be considered in the context of all similar or related transactions." *Id.*, § 6.9(c).

Under this provision, Teppco was contractually barred from engaging in the Jonah Joint Venture and Pioneer Sale unless the terms of those transactions were "fair and reasonable," with that standard deemed satisfied if the terms of the transaction were "no less favorable to [Teppco] than those generally being provided to or available from unrelated third parties."

To defeat the application of Section 6.6(e), the defendants cite Section 6.1(a) of the Third LP Agreement. That section provided broad authority to Teppco GP, including:

> full power and authority to do all things and on such terms as [Teppco GP], in its sole discretion, may then deem necessary or desirable, (i) to conduct the business of the Partnership ... including, without limitation, ... (C) the acquisition, disposition ... or exchange of any or all of the assets of the Partnership [and] (I) the formation of, or acquisition of an interest in, and the contribution of property to ... joint ventures.

Third LP Agreement § 6.1(a). Section 6.9(b) further provided that when Teppco GP is given authority to act in its "sole discretion," it "shall be entitled to consider only such interests and factors as it desires and shall have no duty or obligation to give any consideration to any interest of, or factors affecting, the Partnership or

any Subsidiary, any Limited Partner or any Assignee." *Id.*, § 6.9(b).

 The defendants contend that Section 6.1(a), and not Section 6.6(e), governed the Pioneer Sale and Jonah Joint Venture. This strained argument does not construe the Third LP Agreement as a whole or in accordance with its plain meaning. Section 6.1(a) is a general grant of authority to manage the partnership. It covers everything the general partner does or can do when exercising its managerial role, including but not limited to a list of thirteen categories of actions. Section 6.6(e) is a specific provision that addresses the subset of actions and transactions authorized by Section 6.1(a) involving affiliates. If the general and overarching grant of authority in Section 6.1(a) prevailed over Section 6.6(e), then the latter provision could never apply and would be read out of the agreement. The two provisions can be read harmoniously together by recognizing that Section 6.1(a) creates a general standard under which the general partner is authorized to act in its "sole discretion" when managing the partnership, subject to the requirements of Section 6.6(e) in those specific cases when that provision applies. This plain meaning analysis reads the Third LP Agreement as a whole and avoids rendering Section 6.6(e) a nullity. *Katell v. Morgan Stanley Group, Inc.*, 1993 WL 205033, at *4 (Del. Ch. June 8, 1993) ("I must read the [Limited] Partnership Agreement as a whole, giving effect to all provisions therein."). It also comports with the interpretive principle that a more specific provision prevails over a more general one. *See id.* (applying principle to limited partnership agreement). There is also the principle that if two conflicting provisions create ambiguity, the conflict is resolved "against the general partners who drafted the contract." *Id.*

The defendants argue that under *Gelfman v. Weeden Investors, L.P.*, 792 A.2d 977 (Del.Ch.2001), the "sole discretion" standard defined in Section 6.9(b) and applied generally as the default rule for general partner decision-making under Section 6.1(a) trumps Section 6.6(e). In *Weeden*, Vice Chancellor Strine interpreted a different form of a conflict of interest provision that authorized the general partner to resolve any conflict of interest between the general partner and its affiliates "considering, in each case, the relative interests of each party to such conflict, agreement, transaction or situation and the benefits and burdens relating to such interest, any customary or accepted industry practices, and any applicable generally accepted accounting principles." *Id.* at 985. The very next provision in the agreement provided that:

> [Whenever the general partner is] permitted or required to make a decision ... in its "sole discretion" or "discretion," with "complete discretion" or under a grant of similar authority or latitude, the General Partner shall be entitled to consider only such interest and factors as it desires and shall have no duty or obligation to give any consideration to any interest of or factors affecting the Partnership, the Operating Partnership, the Limited Partners, or the Assignees.

*Id.* Vice Chancellor Strine held that the conflict of interest provision which empowered the general partner to make a discretionary decision involving multiple factors implicated the type of discretionary "authority or latitude" that enabled the general partner "to consider only such interest and factors as it desires." *Id.* at 986. *Weeden* does not hold that "sole discretion" language inherently trumps any conflict of interest provision. Nor did *Weeden* involve a conflict of interest provision like Section 6.6(e), which is framed as an explicit prohibition on affiliate transactions that did not meet the requisite contractual standard.

I therefore believe that Section 6.6(e), and not Section 6.1(a), governs the claims in the Derivative Action. Whether the terms of the Pioneer Sale and the Jonah Joint Venture met the contractual standard established by Section 6.6(e) is a hotly disputed issue. At this stage of the case, I believe the plaintiffs have made a strong showing that the terms of the transactions dramatically undervalued Teppco's assets, were structured by conflicted fiduciaries who had powerful economic and personal reasons to favor Enterprise, were less favorable to Teppco than a third party transaction, and were unlikely to meet the "fair and reasonable" test. I thus believe that there is a strong case to be made that Section 6.6(e) was breached.

To the extent the plaintiffs pursued claims in the Derivative Action for common law breaches of fiduciary duty, I regard those claims as non-meritorious. The LP Act permits the parties to a limited partnership agreement to limit or eliminate fiduciary duties. 6 *Del. C.* § 17–101(d). Section 6.9(b) implements this authority by providing as follows:

> Whenever this Agreement ... provides that a General Partner or any of its Affiliates is permitted or required to make a decision (i) in its "sole discretion" or "discretion," that it deems "necessary or appropriate" or under a grant of similar authority or latitude ... or (ii) in "good faith" or under another express standard, the General Partner or such Affiliate shall act under such express standard and shall not be subject to any other or different standard imposed by this Agreement, the Operating Partnership Agreements, any other agreement

contemplated hereby or under the Delaware Act or any other law, rule or regulation.

Third LP Agreement § 6.9(b); *see id.,* § 6.10(d) ("Any standard of care and duty . . . under the Delaware Act or any applicable law, rule or regulation shall be modified, waived or limited as required to permit the General Partner to act under this Agreement . . . so long as such action is reasonabl[y] believed by the General Partner to be in the best interests of the Partnership.").

Section 6.6(e) is an "express standard" that replaces default fiduciary rules. When engaging in the Pioneer Sale and the Jonah Joint Venture, the defendants were required to comply only with Section 6.6(e) and were "not . . . subject to any other or different standard imposed by this Agreement, the Operating Partnership Agreements, any other agreement contemplated hereby or under the Delaware Act or any other law, rule or regulation." *Id.,* § 6.9(b).

The claims in the Merger Action are weaker because they are governed by a different and more defendant-friendly set of provisions. In September 2006, after engaging in the Jonah Joint Venture and Pioneer Sale earlier that year, Teppco's Duncan-controlled general partner proposed that the holders of Teppco LP units approve a Fourth Amended and Restated Agreement of Limited Partnership of Teppco Partners, L.P. (the "Fourth LP Agreement") that would give Teppco GP considerably more flexibility to engage in transactions with Enterprise and other Teppco's affiliates. The holders of a majority of the outstanding Teppco LP units approved the amendments on December 8, 2006.

The amended Section 6.6(e) provided as follows:

Neither the General Partner nor any of its Affiliates shall sell, transfer or convey any property to, or purchase any property from, the Partnership, directly or indirectly, except pursuant to transactions that are fair and reasonable to the Partnership; provided, however, that the requirements of this Section 6.6(e) shall be deemed to be satisfied as to any transaction *(i) approved by Special Approval, or* (ii) the terms of which are no less favorable to the Partnership than those generally being provided to or available from unrelated third parties.

Fourth LP Agreement § 6.6(e) (emphasis added). The amended Section 6.9(a) stated:

Unless otherwise expressly provided in this Agreement or the Operating Partnership Agreements, whenever a potential conflict of interest exists or arises between the General Partner or any of its Affiliates, on the one hand, and the Partnership or any Subsidiary, any Partner or any Assignee, on the other hand, any resolution or course of action by the General Partner or its Affiliates in respect of such conflict of interest . . . shall not constitute a breach of this Agreement . . . or of any duty stated or implied by law or equity, if the resolution or course of action is or, by operation of this Agreement is deemed to be, fair and reasonable to the Partnership: *provided* that any conflict of interest or any resolution of such conflict of interest shall be conclusively deemed fair and reasonable to the Partnership if such conflict of interest or resolution is *(i) approved by Special Approval, or* (ii) on terms objectively demonstrable to be no less favorable to the Partnership than those generally being provided to or available from unrelated third parties.

*Id.,* § 6.9(a) (emphasis added). Under the Fourth LP Agreement, "Special Approval"

was defined simply as "approval by a majority of the members of the [Teppco Audit Committee]." *Id.*, art. 2.

This combination of provisions in the Fourth LP Agreement enables the defendants to argue that they necessarily prevail on any claim challenging a transaction governed by Section 6.6(e) if the transaction was approved by a majority of the members of the Teppco Audit Committee. While I agree that those provisions establish a weighty defense, the syllogism of "if Teppco Audit Committee approval, then judgment for the defendants" does not automatically follow. In language employed by Vice Chancellor Lamb when rejecting a similarly absolutist interpretation of a special approval provision, it is "much too simplistic." *U.S. Bank Nat'l Assoc. v. U.S. Timberlands Klamath Falls, L.L.C.*, 2004 WL 5388052, at *12 (Del.Ch. Dec.22, 2004). At a minimum, the approval must have been given in compliance with the implied covenant of good faith and fair dealing, which a partnership agreement "may not eliminate." 6 *Del. C.* § 17–1101(d). More importantly, the special approval provision in the Fourth LP Agreement did not confer on the Teppco Audit Committee the right to make the special approval determination in its "sole discretion" or under a similar contractual grant of authority, as did the limited partnership provision at issue in *Brickell Partners v. Wise*, 794 A.2d 1 (Del.Ch.2001). The inclusion of such a standard led Vice Chancellor Strine to dismiss a relatively bare-bones complaint challenging an affiliate transaction that had received special approval. *Id.* at 4–5. The record here is quite different, and the parties would have to join issue on whether some form of reasonableness standard would apply under the Fourth LP Agreement.

On the record before me and in light of the particular language of this special approval provision, resolving the claims presented in the Merger Action would require factual development and a trial. This is particularly so given that the merger which received "special approval" would extinguish strong claims against a controller, his colleagues, and his principal entities. While I do not believe that the claims in the Merger Action were as strong as the claims in the Derivative Action, they did present a meaningful litigation threat.

### 2. The Potential Value Of The Plaintiffs' Claims

I next consider the potential value of the plaintiffs' claims. In their brief in support of the settlement and during the settlement hearing, the plaintiffs contended that they could recover a large damages award in the Derivative Action. They estimated the damages resulting from the Pioneer Sale at approximately $639 million and from the Jonah Joint Venture at approximately $90 million, for a total of $729 million. If a remedy were based on disgorgement of Enterprise's profits, the plaintiffs contended the amount could be in the neighborhood of $1.9 billion. All amounts are without interest.

These are not pie-in-the-sky numbers. In opining on the fairness to Enterprise of the Pioneer Sale, Simmons valued what Enterprise got at $780 million, for which Enterprise gave $38 million. Simmons' fairness analysis of the Jonah Joint Venture similarly shows that its value was much higher as a going concern than based on invested capital. The defendants counter that Teppco could not have achieved those values unless it first entered into the Pioneer Sale. They contend EnCana would not have entered into the agreements for the Jonah Expansion unless Enterprise had backstopped Teppco through the Pioneer Sale, and thus Teppco

could not have been damaged. Although I cannot lightly reject the defendants' arguments, it is not clear what I might have concluded after trial about Teppco's available alternatives and the degree to which conflicted fiduciaries pursued them.

The defendants' "no damages" talk contrasts with their actions. They decided to pursue a merger on the heels of four depositions in which the plaintiffs showed the strength of their claims. The plaintiffs say the defendants previously passed on at least one opportunity to merge Teppco and Enterprise at a time the plaintiffs regard as financially more favorable to Enterprise. The defendants simultaneously accepted the plaintiffs' prior offer to mediate, in which they formerly showed no interest. This could be construed as a temporizing maneuver to halt the litigation while merger discussions got underway. Enterprise made a formal merger proposal on March 9, 2009, but no announcement was made until fifty-seven days later when the actual mediation date was fast approaching. Most significantly, while critiquing the work of the plaintiffs' experts, the defendants' expert prepared an alternative and "corrected" version of the plaintiffs' expert's analysis that showed damages to Teppco of approximately $222.3 million using the plaintiffs' pricing assumptions, and approximately $139.6 million using Teppco management assumptions.

In addition to the plaintiffs and defendants, the Teppco Special Committee regarded the Derivative Action as having real value. The committee minutes are replete with references to the Derivative Action. On February 26, 2009, a week after Enterprise first proposed a merger to Teppco, the Teppco GP board "determined that it would be appropriate for the Teppco [Audit] Committee to consider and evaluate any impact the Derivative Action might have on a potential transaction with Enterprise." On March 24, 2009, the Teppco Audit Committee hired Potter Anderson for advice on Delaware law and for special expertise on the Derivative Action. That same day, the Teppco Audit Committee resolved to advise Enterprise that its initial offer price "was unacceptably low because, among other things, it inadequately valued Teppco's business and did not take into account the potential value of the Derivative Action."

The proxy statement for the Merger discloses that during the first three weeks of April 2009, Daigle—who labored at the time as the "Project Chairman" of an otherwise conflicted Teppco Audit Committee—"held numerous conversations with representatives of Mayer Brown and Potter Anderson to assess the merits of the Derivative Action and the impact of the potential [Merger] on the Derivative Action." On April 22, 2009, two new directors joined the Teppco GP board and the Teppco Audit Committee, and the Teppco Special Committee was formed.

On May 6, 2009, the Teppco Special Committee met with plaintiffs' counsel and their advisors. Prior to the meeting, plaintiffs' counsel provided the Teppco Special Committee with a presentation and copies of a score of key documents. One of the plaintiffs' experts provided a presentation on damages. The meeting lasted four to five hours. At the conclusion of the meeting, the Teppco Special Committee asked for the plaintiffs' "bottom line" estimate of settlement value. Plaintiffs' counsel advised that the minimum settlement would be $300 million and a good settlement would be $500 million.

On May 19, 2009, the Teppco Special Committee made its counteroffer of 1.48 Enterprise LP units for each Teppco LP unit. The minutes of the committee's May 18, 2009, meeting indicate that the offer reflected a value for the Derivative Action

of $500–$600 million. This implies that the Teppco Special Committee regarded the plaintiffs' range as credible and started bargaining at the upper end. Daigle testified that in discussing the Derivative Action with Enterprise, he conveyed that the plaintiffs had a "very strong case"—a noteworthy statement even for negotiations. Between March 4 and June 28, 2009, the Derivative Action was discussed at twelve out of eighteen committee meetings.

Thanks to the supplementation of the record by the Teppco Special Committee, I have a fifty-two page valuation of the Derivative Action that Houlihan Lokey prepared for the committee at the direction of Potter Anderson. To build up a valuation, Houlihan Lokey identified a range of possible outcomes along a decision tree for the litigation and had Potter Anderson assign a probability to each. The first branch in the tree was whether the parties would settle voluntarily. The branch that assumed they did ended in a node with a value derived from the assumed settlement range multiplied by the probability of that outcome. The branch that assumed the parties did not settle continued to another branch for the outcome after trial. One branch assumed a victory for plaintiffs, the other a victory for defendants, with a probability assigned to each. Each of those branches then split based on whether the losing party appealed. The branches where an appeal was taken then split based on which party prevailed after an appeal. Where each branch ended, a node valued that outcome. By adding up the present value of the different nodes, Houlihan Lokey generated an overall risk-adjusted value for the case.

I have reviewed the probabilities that Potter Anderson assigned to the various outcomes, and while it is possible to quibble here or there, I regard them as reasonable. Houlihan Lokey derived its own damages estimates by valuing the Pioneer Sale and the Jonah Joint Venture. The supplemented record reflects that Potter Anderson and the Teppco Special Committee did not accept Houlihan Lokey's analyses at face value, but rather critiqued them and asked Houlihan Lokey to make modifications that increased the range of value ascribed to the Derivative Action. Again one might quibble with a point or an assumption, but the overall valuation appears reasonable, recognizing that Houlihan Lokey's work has not been tested by the adversarial process.

The unredacted minutes and the Potter Anderson affidavit further inform me that when advising the Teppco Special Committee, Potter Anderson did not simply accept Houlihan Lokey's result. Believing a court might rely on other inputs to depart upwards in deriving a damages award, Potter Anderson advised the Teppco Special Committee to use a range with an upper bound materially above what Houlihan Lokey calculated.

Based on this record, I have no difficulty concluding that the claims in the Derivative Action had significant, albeit contingent, value. Subject to the inherent uncertainty of the settlement process, I believe the risk-adjusted value of the Derivative Action was approximately $100 million, and possibly higher.

### 3. The Value Of The Consideration Provided By The Merger In Exchange For The Settlement Of Claims

I finally weigh the consideration provided by the Merger in exchange for the settlement of all claims. In considering what the Teppco Special Committee and plaintiffs' counsel obtained, I must confront a troubling fact: Although I am persuaded that the Merger benefited the Teppco LP unitholders, it is not possible to

determine the degree to which the terms of the Merger compensated them for the Derivative Action. Put bluntly, the Merger could well have been the deal that the Special Committee would have negotiated anyway.

Certain aspects of the Teppco Special Committee's negotiations lead me to question whether the committee actually got value for the Derivative Action. Enterprise opened with 1.043 Enterprise LP units, representing a no-premium deal plus one dollar in cash for the foregone present value of Teppco's higher cash distributions. Framed solely in units, this implied an exchange ratio of 1.083. When the Teppco Special Committee countered, it proposed an all-unit deal at 1.48, for a premium of 37% over the original offer. Oddly, the Teppco Special Committee told Enterprise that an all-unit deal would avoid calling attention to Enterprise's lower distribution rate and save Enterprise the trouble of a Rule 13e–3 filing. Although Daigle's supplemental affidavit offers a harmless explanation for this comment, it nevertheless softens the appearance of hardnosed negotiations.

After the Teppco Special Committee countered, Enterprise took more than a month before coming back on June 15, 2009, with a proposed ratio of 1.197, representing an increase of 0.114 Enterprise LP units and a premium of 10.5% over the at-market offer. Within twenty-four hours, the Teppco Special Committee had countered at 1.275, a drop of 0.205 Enterprise LP units, then agreed to split the difference at 1.24. In the context of a controlling stockholder transaction, a skeptical mind might wonder about the illusion of resistance followed by the reality of submission.

I also do not share the parties' unbridled enthusiasm for the approximately 14.5% premium the Teppco Special Committee

obtained. Pointing out that Duncan already controlled Teppco, the parties argue that Enterprise did not need to pay a premium and therefore 14.5% was both significant and largely attributable to the Derivative Action. Premiums are routinely paid in *Kahn v. Lynch* squeeze-out mergers and in two-step *Siliconix* transactions, both of which by definition involve the acquisition of a controlled company, and regardless of whether the transaction consideration is cash or stock. Guhan Subramanian, *Post–Siliconix Freeze-outs: Theory and Evidence*, 36 J. Legal Stud. 1 (2007). Professor Subramanian's analysis suggests that stockholders receive cumulative abnormal returns of 18.2% in completed *Siliconix* deals using measurements taken 30 days before and 250 days after deal announcement. *Id.* at 14. Stockholders receive cumulative abnormal returns of 38.6% in *Kahn v. Lynch* mergers across the same measurement period. *Id.* Against these data, a 14.5% premium does not suggest an exceptional result or particular value for the derivative claims.

Contemporaneous financial analyses reinforce the point. The Teppco Special Committee's advisor, Credit Suisse, used a comparable companies analysis and a discounted cash flow analysis to arrive at implied values for Teppco and Enterprise. In its comparable companies analysis, Credit Suisse derived a reference range for the enterprise value of comparable companies calculated as a multiple of EBITDA. Credit Suisse used that reference range to calculate an implied enterprise value for Teppco, then backed out Teppco's debt to calculate an implied aggregate equity value and an implied equity value per LP unit. Credit Suisse performed parallel calculations for Enterprise. Using those implied ranges, Credit Suisse derived a range of fair exchange ratios for the Merger running from 0.979 to 1.511

Enterprise LP units per Teppco unit. Nowhere did Credit Suisse make any adjustments for the Derivative Action. Credit Suisse did not, for example, select a higher or lower multiple. Nor did Credit Suisse treat the Derivative Action as a non-operating asset about which a market that was efficient in the semi-strong sense lacked meaningful information (much of which remained in the discovery record and under seal). To address this, after generating the values implied by its EBITDA multiple analyses, Credit Suisse might have added something for the Derivative Action to Teppco and subtracted the same amount from Enterprise. They did not.

The same was true for Credit Suisse's discounted cash flow analysis. Using standard valuation techniques, Credit Suisse calculated a range of implied equity values for Teppco and Enterprise, then derived a range of fair exchange ratios for the Merger. The discounted cash flow analysis generated a range of 0.882 to 1.266 Enterprise LP units per Teppco LP unit. Credit Suisse did not account for a one-time increase in cash flow for Teppco and a corresponding one-time decrease for Enterprise resulting from the Derivative Action. Nor did Credit Suisse factor in the Derivative Action as a non-operating asset.

The financial advisors who opined on the Merger for Enterprise and for Enterprise Holdings conducted quite similar analyses and did not incorporate any value for the Derivative Action. The public analyst reports that the plaintiffs submitted do not refer to or value the Derivative Action.

All of these financial analyses suggest that the Merger offered a fair price for Teppco *without* the Derivative Action. They do not address whether the consideration was fair *with* the Derivative Action.

And there are other factors that give me pause:

- The Teppco LP unitholders did not have appraisal rights in the Merger. Although our courts have questioned whether appraisal is an adequate remedy, *e.g., Andra v. Blount,* 772 A.2d 183, 192–93 (Del.Ch.2000), even that alternative was unavailable to the Teppco LP unitholders.
- The Teppco Special Committee caved on its insistence that any majority-of-the-minority vote be calculated as a majority of the Teppco LP units outstanding, as Delaware law requires. *In re PNB Holding Co. S'holders Litig.,* 2006 WL 2403999, at *14–15 (Del. Ch. Aug. 18, 2006). The Special Committee instead accepted a provision where the majority-of-the-minority would be based on shares voting. Because Teppco LP unitholders lacked meaningful information about the Derivative Action, I regard the minority vote in favor of the Merger as endorsing the economics of the deal exclusive of the Derivative Action.
- The plaintiffs fell happily into *Cox Communications* mode. They did not challenge the defendants' assertion that standing would be extinguished by the Merger, did not try to litigate the Merger Action, and did not move for a preliminary injunction or other equitable relief. Their only ask after the Teppco Special Committee and Enterprise reached a deal was for Enterprise to commit to increase its distributions to match Teppco's. When Enterprise said no, plaintiffs jumped on board.
- The fee that the defendants agreed not to oppose was $17.5 million plus $1.5 million in expenses, which would be among the largest fees awarded by this Court. For that matter, Credit Suisse's fee for representing the Teppco Special Committee was $9 million, comprised of a $250,000 retainer, $5 million for a fairness opinion, and $3.75

million contingent on closing. And when objectors appeared, the defendants settled the objection on the eve of the settlement hearing for two pages of skimpy supplemental disclosures and an agreement not to oppose an additional award of fees and expenses of up to $500,000. Plaintiffs' counsel agreed to pay half the objectors' fee. Money solves problems, and a lot of it was thrown around.

Against these concerns I must balance a record in which a special committee comprised of independent, outside directors with no ties to the controller appear to have acted in good faith to negotiate the terms of a premium transaction. The Teppco Special Committee was advised by a reputable national law firm and well-known Delaware counsel. It retained an experienced financial advisor for deal advice and, through counsel, a second financial advisor with experience valuing litigation assets.

With the assistance of its independent advisors, the Teppco Special Committee acted appropriately to obtain detailed information about the value of the Derivative Action and to negotiate a transaction on that basis. The unredacted minutes reflect correct advice about the directors' obligation to value the Derivative Action and to ensure that the terms of the Merger included reasonable consideration for those claims.

I also have considered the one-page sensitivity analysis that the supplemented record reveals Credit Suisse to have prepared and provided to the Teppco Special Committee in connection with its approval of the Merger. That analysis showed how the fairness of the exchange ratio in the Merger would be affected if the Derivative Action was valued according to the Special Committee's assumptions or at a higher value of $500 million, which I believe ex-

ceeds the risk-adjusted value of the case. In both cases, the Merger exchange ratio remains within the range of fairness.

I have further considered the plaintiffs' meaningful litigation efforts in the Derivative Action. Although the plaintiffs fell easily into *Cox Communications* mode, prior to that they engaged in real work, took on real risk, and created a litigation asset that I regard as having prompted the defendants to pursue the Merger. If the Teppco Special Committee had not approached its job diligently or failed to obtain fair terms for the Merger, I believe the plaintiffs might have roused themselves to action.

I ultimately must apply my own judgment to determine whether I believe the settlement is fair and reasonable. Perfection is an unattainable standard that Delaware law does not require, even in a transaction with a controller. The record as a whole supports the view that the Teppco Special Committee used the Derivative Action as an effective negotiation tool to increase the Merger consideration and obtain a fair result. Although the question is close, and although I continue to have concerns, I approve the settlement as fair and reasonable.

## B. Attorneys' Fees

 The defendants agreed not to oppose an award to plaintiffs' counsel of $17.5 million in fees plus $1.5 million in expenses. I will determine an all-in award based on the factors identified in *Sugarland Industries, Inc. v. Thomas*, 420 A.2d 142 (Del.1980). As Vice Chancellor Strine has explained, an all-in award is more straightforward for the Court and incentivizes counsel to be efficient with expenses. *In re Telecorp PCS, Inc. S'holders Litig.*, C.A. No. 19260, at 101, 2003 WL 22901025 (Del.Ch. Nov.19, 2003) (TRANSCRIPT). I do not regard the parties' agreement on

a fee award as dispositive. This Court "must make an independent determination of reasonableness." *Goodrich v. E.F. Hutton Group, Inc.*, 681 A.2d 1039, 1045–46 (Del.1996). "The fact that a fee is negotiated ... does not obviate the need for independent judicial scrutiny of the fee because of the omnipresent threat that plaintiffs would trade off settlement benefits for an agreement that the defendant will not contest a substantial fee award." *Nat'l City*, 2009 WL 2425389, at *5.

 Chief among the *Sugarland* factors is the results generated by the litigation. Here, I believe the efforts of plaintiffs' counsel created an asset worth approximately $100 million for which Teppco LP unitholders received fair value in the Merger. I do not regard the Merger Action or the plaintiffs' role in the *Cox Communications* gavotte as conferring any meaningful incremental benefits.

In setting a fee, I consider the level of contingency risk that the plaintiffs took. *Sugarland*, 420 A.2d at 149. In pursuing the Derivative Action, plaintiffs' counsel undertook real contingency risk. Plaintiffs' counsel did not take the case through trial, but did engage in significant litigation efforts, including extensive document discovery and four depositions. Once the parties shifted into *Cox Communications* mode, the plaintiffs' risk was substantially mitigated. 879 A.2d at 640–41.

Plaintiffs' counsel advises me that they worked approximately 10,000 hours on the litigation. They did not divide their hours and expenses to distinguish pre-settlement from post-settlement work.

Measured against the *Sugarland* factors, the request for $19.5 million is excessive. I award an all-in sum of $10 million, representing approximately 10% of the benefits conferred by the Derivative Action. I select this percentage to reflect the plaintiffs' substantial litigation effort while recognizing that the bulk of the litigation remained: at least three-quarters of the fact depositions still needed to be taken, along with all of the expert discovery, trial preparation, and trial. Like Vice Chancellor Strine, I believe that higher percentages are warranted when cases progress further or go the distance to a post-trial adjudication. *See Telecorp*, C.A. No. 19260, at 103 (TRANSCRIPT) ("I could see holding out the full measure of 33 to maybe 35 percent [so] that there's a promise actually if you go to trial, it will be at the highest end of the range.").

As a cross-check based on the approximately 10,000 hours that plaintiffs claim, my award represents an effective hourly rate of $1,000. This figure accounts for the degree of contingent risk the plaintiffs undertook and rewards them for the benefits achieved.

Plaintiffs' counsel has sought leave to pay $100,000 to lead plaintiff Brinckerhoff. I am told Brinkerhoff spent approximately 1,000 hours assisting on the litigation. Some additional compensation for this effort is warranted. I approve the request.

 Finally, counsel to two objectors seeks their own fee award. On April 29, 2009, the same day that Teppco announced Enterprise's merger proposal, the law firm of Robbins Umeda LLP sent a letter to the Teppco GP board expressing concern about the proposed transaction. On June 29, 2009, the firm filed a class action lawsuit in the District Court of Harris County, Texas. On June 30, 2009, a second firm filed a parallel action in the same court, and those actions were consolidated. There is no indication that any litigation activity took place.

The Texas plaintiffs objected to the settlement. In a motion to compel, they raised appropriate questions about process

and fairness. Given my own concerns, I hoped the objectors would provide the Court with the benefit of true adversarial discovery and briefing. Instead, by stipulation dated October 7, 2009, the objectors settled their objection in return for a two-page supplemental disclosure to be filed by Teppco as a Form 8–K and the defendants' agreement not to oppose a fee petition for up to $500,000.

Meaningful objections can help ensure the fairness of settlements in representative actions. I have no difficulty awarding fees to objectors who contribute to the process, and an objector who successfully demonstrates that a settlement is unfair is a logical candidate to take over prosecution of the litigation.

Here, the objectors did not add meaningfully or create the type of benefits that merit more than a nominal fee award. The objectors' suggestion that they were "a causative factor to the increase in merger consideration" passes Rule 11 only because our law presumes a causal link, and the defendants have not sought to disprove it. *Tandycrafts, Inc., v. Initio Partners,* 562 A.2d 1162, 1167 (Del.1989). The supplemental disclosures provided some additional information and conferred a marginal benefit by helping to ensure that the vote on the Merger was informed.

In an affidavit, Brian J. Robbins of the Robbins Umeda firm avers that Texas counsel "spent at least 2,760.2 hours combined in prosecuting the Texas Actions and in litigating the Objections, for a total lodestar of $1,023,015.00." No supporting records have been provided. I regard the number of hours claimed as facially implausible, and I do not credit it. I also do not believe the objectors took on meaningful contingency risk.

Nevertheless, under our law, the supplemental disclosures merit a fee award of some amount. I award $80,000.

## III. CONCLUSION

For the reasons set forth in this opinion, I approve the settlement as fair and reasonable. I award $10 million in fees and expenses to plaintiffs' counsel in the Derivative Action and Merger Action, approve plaintiffs' counsel's request to pay $100,000 to Brinkerhoff, and award $80,000 in fees and expenses to the objectors' counsel. I have entered a final order implementing these rulings.